1

2

3

4

5

6           IN THE UNITED STATES DISTRICT COURT FOR THE

7              EASTERN DISTRICT OF CALIFORNIA

8

9  KERRY D. FRITZ II,           )     No. CV-F-07-377 OWW/TAG
                                )
10                              )     MEMORANDUM DECISION GRANTING
                                )     IN PART WITH PREJUDICE,
11              Plaintiff,       )     GRANTING IN PART WITH LEAVE
                                )     TO AMEND AND DENYING IN PART
12         vs.                   )     DEFENDANTS' MOTIONS TO
                                )     DISMISS SECOND AMENDED
13                              )     COMPLAINT (Docs. 54, 55, 56,
   KERN COUNTY, CA, et al.,      )     57 & 58)
14                              )
                                )
15              Defendant.       )
                                )
16 _____)

17

18         Pursuant to Memorandum Decision filed on August 30, 2007

   (Doc. 49) (hereinafter August 30 Decision), Kerry D. Fritz II,
19
   proceeding *in pro per*, filed a Second Amended Complaint (SAC) on
20
   October 1, 2007.
21
           The SAC names as defendants the County of Kern, Crestwood
22
   Behaviorial Health Inc., the Superior Court of the State of
23
   California for the County of Kern, Kern County Deputy Sheriff
24
   Phillip Garza, and Public Defenders Phil Begelin and Dana
25
   Kinnison.  As discussed *infra*, the SAC fails in every respect to
26

                              1

comply with Rule 8(a)(2) and is very difficult to follow, despite direction to Plaintiff to provide a concise and clear statement of his claims.  However, the gravamen of the SAC is that Plaintiff was arrested without probable cause and/or on fabricated evidence for a misdemeanor violation of a temporary restraining order pursuant to California Penal Code § 166(4), which temporary restraining order was obtained against Plaintiff by one of his neighbors; that Plaintiff was subjected improperly to mental competency proceedings pursuant to California Penal Code § 1368, which resulted in his remand to Crestwood; that Plaintiff was kept at Crestwood longer than he would have been incarcerated if he had been convicted of violation of the temporary restraining order, which resulted in the dismissal of the misdemeanor charge; that, while detained at Lerdo, Plaintiff was denied x-rays for a back injury which would have shown that his back was broken; and that Plaintiff was denied the effective assistance of public defenders.

> A.   <u>GOVERNING STANDARDS</u>.

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint.  *Novarro v. Black*, 250 F.3d 729, 732 (9th Cir.2001).  Dismissal of a claim under Rule 12(b)(6) is appropriate only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  Dismissal is warranted under Rule 12(b)(6) where the complaint lacks a cognizable legal theory or where the complaint

presents a cognizable legal theory yet fails to plead essential facts under that theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir.1984).  In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir.2002).  The court must construe a *pro se* plaintiff's pleadings liberally in determining whether a claim has been stated. *Ortez v. Washington County, State of Or.*, 88 F.3d 804, 807 (9th Cir. 1996); *Eldridge v. Block*, 832 F.2d 1132, 1137 (9th Cir. 1987). However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir.2003).  Immunities and other affirmative defenses may be upheld on a motion to dismiss only when they are established on the face of the complaint. *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir.1999); *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980)  When ruling on a motion to dismiss, the court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice. *Parrino v. FHP, Inc*, 146 F.3d 699, 705-706 (9th Cir.1988).

Rule 8(a)(2), Federal Rules of Civil Procedure, requires that a pleading set forth a short and plain statement of the

claim showing that the pleader is entitled to relief.  Under Rule 8(a)(2), a pleading must give fair notice and state the elements of the claim plainly and succinctly.  *Jones v. Community Redevelopment Agency*, 733 F.2d 646, 649 (9th Cir. 1984).  A complaint that is verbose, conclusory and confusing does not comply with Rule 8(a)(2).  *Nevijel v. North Coast Life Ins. Co.*, 651 F.2d 671, 674 (9th Cir. 1981).  However, before a district court's dismissal of a complaint without leave to amend will be affirmed, the district court must have first adopted less drastic alternatives, such as advising plaintiff of the deficiencies in the pleading and giving leave to amend to correct them.  *Id.*

>           1.   <u>PROCEDURALLY IMPROPER ALLEGATIONS</u>.

The SAC contains numerous procedurally improper allegations. Paragraph 10 alleges: "All Counts/Causes of Action are based upon, in part, Attachment C to docket entry # 38 and Attachment C to docket entry # 39 in this action.  Counts/Cause of Action IV is based, in part on the aforementioned, as well as docket entry # 20-25."  The SAC also incorporates by reference various paragraphs alleged in the First Amended Complaint:

> 11) I.  Paragraphs 8 through 123 and paragraphs 139-140, 145-149, 153, 158-159, 161-162, 167, 170, 172, 200, 234, 250 and 256 of docket entry #5 are hereby incorporated by reference ....
>
> ...
>
> 27) II.  Paragraphs 141 through 143, 151, 186-187, 189-190, 199, 221-222, 228-233, 235-236, 252, 256-257, and 259-260 of docket entry # 5 are hereby incorporated by reference ....

4

1          ...

2          30) III.  Paragraphs 263 through 386 of
           docket entry # 5 are hereby incorporated by
3          reference ....

4          ...

5          38) IV.  Paragraphs 245 through 251, 253-254,
           and 261-387 of docket entry # 5 are hereby
6          incorporated by reference ....

7          ...

8          42) V.  Paragraphs 140, 148-150, 153 of
           docket entry # 5 are hereby incorporated by
9          reference ....

10         ...

11         44) VI.  Factual paragraphs 133 through 136,
           144-145, 168, 171, 173, 177-183, 185, 188,
12         191-198, 201-218, 223-227, 238-251, 253-254,
           276-289, 286, 295, 299-300, 317-319, 326,
13         342, 344-346, 350-352, 354, 360-364, 372-378,
           380-381, and 386 of docket entry # 5 are
14         hereby incorporated by reference to this
           count/cause of action ....

15         ...

16         48) VII.  Paragraphs 3 through 421 and the
17         materials referenced therein of docket entry
           # 5 are hereby incorporated by reference
18         herein ....

19  The SAC also contains numerous citations to statutes and cases.

20       In the face of Defendants' objections to this type of

21  pleading that the SAC is vague, ambiguous and confusing,

22  Plaintiff asserts that these objections are "inappropriate

23  considering Fritz, following the court's order in docket entry #

24  49, only incorporated anything by reference if the court or

25  opposing counsel had any questions and per pleading standards

26  Fritz had previously argued for inclusion but was denied and

                                    5

therefore only incorporated by reference."

Plaintiff cannot proceed in this action with the SAC as it is presently pleaded.  Rule 15-220, Local Rules of Practice, provides in pertinent part:

> Unless prior approval to the contrary is obtained from the Court, every pleading to which an amendment ... has been allowed by Court order shall be retyped and filed so that it is complete in itself without reference to the prior or superseded pleading.  No pleading shall be deemed supplemented until this Rule has been complied with.  All changed pleadings shall contain copies of all exhibits referred to in the changed pleading.

Plaintiff was specifically advised in the August 30 Decision:

> Although Plaintiff is proceeding *in pro per*, Plaintiff is required to familiarize himself and comply with the Federal Rules of Civil Procedure, the Local Rules of Practice for the Eastern District of California, and any Court orders.  Rule 83-183(a), Local Rules of Practice, provides in pertinent part:
>
>> Any individual representing himself or herself without an attorney is bound by the Federal Rules of Civil ... Procedure and by these Local Rules.  All obligations placed on 'counsel' by these Local Rules apply to individuals appearing in propria persona.  Failure to comply therewith may be ground for dismissal ... or any other sanction appropriate under these Rules.

Neither Defendants nor the Court can evaluate and respond to the SAC as presently pleaded.  The August 30 Memorandum Decision held:

> The FAC is 94 pages long and is comprised of 425 paragraphs which took over an hour for

6

the Court to read.  The portion of the FAC entitled "Common Factual Background" runs from Paragraph 8 to Paragraph 397.  The "Common Factual Background" is essentially a narrative description of virtually everything Plaintiff alleges happened to him, on a blow by blow basis.  The FAC includes references to alleged events that preceded any conceivable factual or legal basis for Plaintiff's claims and that have no real relevance to his claims, references, practically word by word of conversations Plaintiff allegedly had with numerous persons, letters that Plaintiff allegedly wrote or received from various persons, telephone calls he allegedly made, references to information that appears to have no relevance or materiality to any claim(s) Plaintiff may be attempting to allege.  Both Defendants correctly argue that the FAC does not comply with Rule 8(a)(2).  The FAC appears to allege that Plaintiff was arrested without probable cause and/or on fabricated evidence for a misdemeanor violation of a temporary restraining order pursuant to California Penal Code § 166(4), which temporary restraining order was obtained against Plaintiff by one of his neighbors; that Plaintiff was subjected improperly to mental competency proceedings pursuant to California Penal Code § 1368, which resulted in his remand to Crestwood; that Plaintiff was kept at Crestwood longer than he would have been incarcerated if he had been convicted of violation of the temporary restraining order, which resulted in the dismissal of the misdemeanor charge; that, while detained at Lerdo, Plaintiff was denied x-rays for a back injury which would have shown that his back was broken; and that Plaintiff was denied the effective assistance of public defenders.

Defendants cannot be expected to respond to a pleading of such length and prolixity, containing many irrelevancies and ambiguities.  Plaintiff is ordered to file a Second Amended Complaint.  The Second Amended Complaint must clearly and succinctly allege only those facts relevant to his claims, clearly name only those employees or officers

> of Defendants who Plaintiff contends violated
> his constitutional rights and what they did
> or did not do to violate his rights, and must
> clearly state the legal basis for the claims.
> A complaint is not a novel - background
> allegations and evidentiary detail are simply
> unnecessary and violate Rule 8(a)(2).  Short
> and plain statements of the elements of the
> claims showing that Plaintiff is entitled to
> relief and giving the Defendants fair notice
> of those claims are required.  Plaintiff is
> advised that a continued failure to comply
> with the requirements of Rule 8(a)(2) is
> grounds for dismissal of an action without
> further leave to amend.

The SAC intentionally evades this ruling by the expedient of incorporating all of the allegations of the FAC which violated Rule 8(a)(2).  Plaintiff cannot proceed in this fashion.  This intentional evasion of the Court's express instructions to Plaintiff display willfulness and an intent to harass, which may be grounds for sanctions up to and including dismissal of the action with prejudice.

Defendants also understandably complain of the confusing format of the SAC.  It is extremely difficult to determine which averments pertain to which causes of action, what the causes of action are, and which defendants are sued in the respective causes of action.  Rule 10(b), Federal Rules of Civil Procedure, provides:

> All averments of claim ... shall be made in
> numbered paragraphs, the contents of each of
> which shall be limited as far as practicable
> to a statement of a single set of
> circumstances; and a paragraph may be
> referred to by number in all succeeding
> pleadings.  Each claim founded upon a
> separate transaction or occurrence ... shall
> be stated in a separate count ... whenever

8

separation facilitates the clear presentation
of the matters set forth.

The August 30 Decision clearly advised Plaintiff of the pleading requirements to satisfy Rule 8 and Plaintiff knowingly failed to comply.  The August 30 Decision stated: "Plaintiff is advised that a continued failure to comply with the requirements of Rule 8(a)(2) is grounds for dismissal of an action without further leave to amend."

Plaintiff must comply with Rule 8(a)(2).  Plaintiff cannot incorporate by reference allegations in prior pleadings. Plaintiff must allege only those *facts* which are necessary to allege the required elements of the claims for relief he is alleging against the various Defendants; narrative, background non-essential evidentiary allegations or citations to statutes or cases are not authorized.  Plaintiff is advised that any continued failure to comply with Rule 8(a)(2) will result in the dismissal of this action.

The SAC prays for "an amount similar to attorney's fees under 42 U.S.C. section 1988 for the past and present cases in this matter and/or under Fed. R. Civ. P. 1, and L.R. 1-3."

A pro se litigant is not entitled to an award of attorneys' fees under Section 1988. *Kay v. Ehrler*, 499 U.S. 432, 435 (1991); *Elwood v. Drescher*, 456 F.3d 943, 946-948 (9th Cir.2006). Consequently, Plaintiff is not entitled to "an amount similar to attorney's fees" under Section 1988.  Plaintiff's references to Rule 1, Federal Rules of Civil Procedure, and Rule 1-3, Local

9

Rules of Practice, do not provide any authority for award of "an amount similar to attorney's fees."  Rule 1, Federal Rules of Civil Procedure provides:

> These rules govern the procedure in the United States district courts in all suits of a civil nature whether cognizable as cases at law or in equity or in admiralty, with the exceptions stated in Rule 81.  They shall be construed and administered to secure the just, speedy, and inexpensive determination of every action.

There is no "L.R. 1-3."  As discussed *infra*, Plaintiff argues that he is suing as a "private attorney general".  If Plaintiff is allowed to proceed in this action as a "private attorney general", he will not be entitled to attorneys' fees as a "private attorney general" pursuant to California Code of Civil Procedure § 1021.5.  *Atherton v. Board of Supervisors*, 176 Cal.App.3d 433 (1986).  This claim for compensation for attorney's fees can never be stated by a plaintiff appearing *in pro per*, as a matter of law.  If it is repeated, Plaintiff will be sanctioned.

B.  **DEFENDANT SUPERIOR COURT OF CALIFORNIA FOR THE COUNTY OF KERN**.

The allegations of the SAC that appear to pertain to Defendant Superior Court of California for the County of Kern are as follows:

> 48) VII.  Paragraphs 3 through 421 and the materials referenced therein of docket entry # 5 are hereby incorporated by reference here.  Substantive Due Process.  Violation against County of Kern Superior Court System.

What happened to Plaintiff Fritz, where the included paragraphs show a pattern or policy, whether associated with only the Plaintiff or upon further discovery it can be seen that Kern County and Crestwood has performed the well-established law violations on others as well.

49) In addition to the above causes of action/counts, this substantive due process violation result is also requested in the totality of the circumstances for:

I. - Superior Court of the County of Kern, Taft-Lamont Division's granting a civil restraining order to the first person who reached the courthouse; even in the face of evidence at the hearing or innocent or protected activity or no harassment in the respective sense that it was happenstance and/or the product of fabrication via paranoia or projection or malice, and where Mr. Martin was allowed to rest on the laurels of his [initial] pleading without proving such allegations;

...

3. - Superior Court of the County of Kern allowing conclusory, unreliable, untrustworthy, conflicting, ambiguous and/or outright false and/or slippery-slope and conclusory allegations to count as probable cause, without independent judicial review of the executive branch's decision and without allowance of a Franks v. Delaware type of hearing even after habeas corpus writ application evidence;

4. - Superior Court of the County of Kern punishment or bias against Fritz for exercising his 6th Amendment right to represent himself under Faretta and its progeny;

5. - 6th Amendment violation policy where County of Kern Superior Court System did not allow confrontation with the witnesses against him in both the:

    a. - PC 166(4) underlying criminal

11

charge context;

b. - PC 1368 context

6. - Superior Court of California, County of Kern allowing prosecutorial misconduct and subversion or prosecutorial vouching in getting off the subject with respect to how the 'Answer' to the restraining order was served, to instead that of the contents of that properly served 'Answer', where it had little or nothing to do with the criminal charge;

...

8. - bias or prejudice (in the relevant incorporated paragraphs) of the County of Kern Superior Court's judges involved vexatiously multiplied the proceedings.

9. - County of Kern's policymakers of that [Taft] area conspiring to persuade the Superior Court of the County of Kern to afford no adversarial process to be allowed to determine the truth in both PC 166(4) and PC 1369 contexts;

10. - the County of Kern Superior Court's judges involved not providing Fritz with a means to clear his name/establish his innocence otherwise provided for under well-established law (since 1972) in the PC 1368 context such as Jackson v. Indiana, 406 U.S. -, 92 S.Ct. 1845;

II. - using the 1368 process for an improper purpose such as:

a.  punishment or purposes unrelated to whether Fritz understood the charges against him and how to rationally defend against them, and;

b.  where Fritz asserted innocence and did not take the plea bargain of 19 days, etc., retaliation for the exercising of the 6th Amendment's [sic] right to go to jury trial;

12

12. - 'speedy trial' issues not addressed in Pederson v. Superior Court, 130 Cal.Rptr.2d 289, but can be shown under the Barker v. Wingo standards;

...

50) These actions and associated causes-of-action/counts' factual predicates of the course of events shocks the conscience of any reasonable person and/or which the Plaintiff or any other person should never have had to have endured and for which Fritz suffered the prolonged pretrial incarceration damages spoken of in Gerstein v. Pugh, 420 U.S. 103 ... (1975)

The SAC prays for compensatory and punitive damages and prays for the following declaratory and injunctive relief:

59) Plaintiff requests Injunctive relief in the form of a reversal or sealing of the record in the matter of Fritz's commitment to Crestwood, as it was against constitutional due process requirements listed throughout Counts V., VI., and VII. [sic] and caused a stigma-plus damages with respect to the listed preferred profession unavailability.

60) The Plaintiff requests declaratory and injunctive relief against the Superior Court of California's policy to not make an independent determination of probable cause and not allowing the affiant officer's or the private citizen's veracity to be questioned, as stated in Count VII.

The Superior Court of California for the County of Kern moves to dismiss the SAC against it on the basis of the Eleventh Amendment to the United States Constitution.

The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of

1   any Foreign State.

2   Claims under 42 U.S.C. § 1983 are limited by the scope of the

3   Eleventh Amendment.  *Doe v. Lawrence Livermore Nat. Laboratory*,

4   131 F.3d 836, 839 (9th Cir.1997).  "States or governmental

5   agencies that are considered 'arms of the State' for Eleventh

6   Amendment purposes' are not 'persons' under Section 1983.  *Will*

7   *v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989).  The

8   Eleventh Amendment bars Plaintiff's claims against the Superior

9   Court for the County of Kern or its employees.  *See Simmons v.*

10  *Sacramento County Superior Court*, 318 F.3d 1156, 1161 (9th

11  Cir.2003).

12      Plaintiff argues that dismissal of the Kern County Superior

13  Court pursuant to the Eleventh Amendment is not required because

14  the SAC is not seeking any damages from the State of California

15  and the SAC is not seeking the type of relief which the Eleventh

16  Amendment bars.

17      Plaintiff asserts that "suits against state ... officials to

18  enjoin them from invading constitutional rights which they

19  subjected Fritz to (or were misled into subjecting the Plaintiff

20  to in the larger context of the action)" is relief not barred by

21  the Eleventh Amendment.

22      Plaintiff relies on *Ex Parte Young,* 209 U.S. 129 (1908).

23      *Ex Parte Young* held that the Eleventh Amendment does not bar

24  suit against a state official acting in violation of federal law:

25          [I]ndividuals who, as officers of the State,
            are clothed with some duty in regard to the
26          enforcement of the laws of the State, and who

                              14

> threaten and are about to commence
> proceedings, either of a civil or criminal
> nature, to enforce against parties affected
> an unconstitutional act, violating the
> Federal Constitution, may be enjoined by a
> Federal Court of equity from such action.

209 U.S. at 155-156.  However, the Supreme Court cautioned:

> In making an officer of the State a party
> defendant in a suit to enjoin the enforcement
> of an act alleged to be unconstitutional, it
> is plain that such officer must have some
> connection with the enforcement of the act,
> or else it is merely making him a party as a
> representative of the State, and thereby
> attempting to make the State a party.

209 U.S. at 157.  The *Ex Parte Young* exception applies only to ongoing and continuous violations of federal law.  *Papasan v. Allain*, 478 U.S. 265, 277-278 (1986); *Green v. Mansour*, 474 U.S. 64, 68 (1985).  Furthermore, "[a]s *Ex Parte Young* explains, the officers of the state must be cloaked with a duty to enforce the laws of the state and must threaten or be about to enforce and unconstitutional act."  *Snoeck v. Brussa*, 153 F.3d 984, 987 (9th Cir.1989).

    The SAC does not name as defendants any individual officials of the State of California.  Plaintiff's reliance on *Ex Parte Young* to overcome the bar of the Eleventh Amendment is misplaced.  *See also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984)("[I]n the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment").[1]

_____

[1]In *Pennhurst, supra,* 465 U.S. at 104, the Supreme Court announced that *Ex Parte Young* allows prospective relief against

1    Plaintiff further asserts that "the decisions of the three

2    Superior Court of California, County of Kern Judges Moench,

3    Phillips, and Kelly can fairly be said to represent County of

4    Kern unconstitutional policy, custom or usage of the County, 'not

5    the word or deed of the state.'"

6    Plaintiff cites *Allen v. Baltimore & O. R. Co.*, 114 U.S. 311

7    (1885), as authority for this proposition.  However, *Allen*

8    involved a suit against an individual state official threatening

9    to enforce allegedly unconstitutional taxation.  The SAC does not

10   name as defendants any individual state officials.

11   Further, judges of the Superior Courts of the State of

12   California are not employed by or agents of the County of Kern.

13   The acts or omissions of judges of the Superior Courts of the

14   State of California do not represent an allegedly

15   unconstitutional policy or practice of the County of Kern.  The

16   judges are state officials.

17   Plaintiff argues that the SAC does not seek "any damages

18   from the State of California and is instead in a 'private

19   attorney general' capacity ... asking the State of California to

20   take money back from the County of Kern for having violated

21   Fritz's procedural and substantive due process and equal

22   protection rights listed within the Counts/Causes of Action

23   section within the SAC and the State has been named as 'only

24   ────────────────────────────

25   state officers only to vindicate rights under federal law.  To the
     extent that the SAC can be construed to vindicate an asserted right
     under state law, *Pennhurst* dictates that the claim be dismissed.

26   *See Spoklie v. Montana*, 411 F.3d 1051, 1060 (9th Cir.2005).

                                    16

1 nominal parties' and where Fritz is 'not trying to sue the

2 [state] government 'behind its back.'"

3       Plaintiff cites *Osborn v. Bank of U.S.,* 22 U.S. 738 (1824).

4 *Osborn* has no applicability as that case involved an action

5 against a state official to enjoin the state official from

6 executing a state law in conflict with the United States

7 Constitution.

8       Further, the SAC contains no allegation or reference to

9 Plaintiff as a "private attorney general".  The prayer for

10 damages in the SAC does pray for "an order for the return of all

11 local, state, and federal originating reimbursement funds taken

12 by the defendants on behalf of Fritz."  The purpose, scope and

13 authority for this prayer for relief is unascertainable.

14 Further, Plaintiff has no standing to assert such a claim.  The

15 claim shall not be re-asserted and is dismissed without leave to

16 amend.

17       Plaintiff, citing *Balistreri v. Pacifica Police Department,*

18 901 F.2d 698 (9th Cir.1990), and *DeShaney v. Winnebago County*

19 *Department of Social Services*, 489 U.S. 189 (1989), argues that

20 "[t]here existed a 'special relationship' ... between his

21 client(s) and Fritz in the past incident's cause of damage to

22 Fritz and the nature is one which allowed the re-occurrence which

23 is still pending, and therefore capable of repeating itself and a

24 potential for 'irreparable harm.'"

25       In *DeShaney*, the Supreme Court held that "a State's failure

26 to protect an individual against private violence simply does not

constitute a violation of the Due Process Clause."   489 U.S. at 197.   The Supreme Court reasoned:

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.  It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

*Id.* at 195.  As explained in *Johnson v. City of Seattle*, 474 F.3d 634 (9th Cir.2007):

> The general rule announced in *DeShaney* that members of the public have no constitutional right to sue state actors who fail to protect them from harm inflicted by third parties 'is modified by two exceptions: (1) the "special relationship" exception; and (2) the "danger created exception."

The special relationship exception arises when the government enters into a special relationship with a party, such as taking the party into custody or placing him into involuntary hospitalization.  The danger created exception arises when affirmative conduct on the part of the state places a party in danger he otherwise would not have been in.  *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir.1992), *cert. denied*, 508 U.S. 951 (1993).

In *Balistreri, supra*, the Ninth Circuit held:

> Several courts have held that, to determine whether a 'special relationship' exists, a court may look to a number of factors, including (1) whether the state created or

18

assumed a custodial relationship toward the plaintiff; (2) whether the state affirmatively placed the plaintiff in a position of danger; (3) whether the state was aware of the specific risk of harm to the plaintiff; or (4) whether the state affirmatively committed itself to the protection of the plaintiff ....

As the district court noted, Balistreri alleged neither that the state had created or assumed a custodial relationship over her, nor that the state actors had somehow affirmatively placed her in danger.  There were no allegations that the defendants had done anything to 'ratify, condone or in any way instigate' the actions of Balistreri's ex-husband ... However, Balistreri did allege that state actors knew of her plight and affirmatively committed to protect her. Specifically, she alleged that the state committed to protect her when it issued her a restraining order.

In the recent case of *DeShaney v. Winnebago County ... Department of Social Services ...*, however, the Supreme Court limited the circumstances giving rise of 'a special relationship.'  Joshua DeShaney fell into a life-threatening coma after he was severely beaten by his father.  Prior to this beating, the social services agency recorded multiple incidents indicating that someone in the DeShaney household was physically abusing Joshua and temporarily placed Joshua in the custody of the juvenile court.  In the course of explaining its holding that Joshua DeShaney and his mother failed to make out an actionable § 1983 claim, the Court explained that its previous decisions recognizing 'affirmative [constitutional] duties of care and protection ... stand only for the proposition that when the State takes a person into its custody and hold him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being ... The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from

19

1

2

3

4

5

6

7

> the limitation which it has imposed on his freedom to act on his own behalf.' *Id*. 109 S.Ct. at 1005-06.  We conclude that the state's knowledge of DeShaney's plight and its expressions of intent to help him were no greater that its knowledge of Balistreri's plight and its expressions of intent to help her ... *DeShaney* is therefore controlling in Balistreri's case.  Accordingly, we hold that Balistreri failed to allege 'a special relationship' and affirm the district court's dismissal of Balistreri's due process claim.

**901 F.2d at 701.**

8

9

10

11

  Plaintiff's reliance on *DeShaney* and *Balistreri* in the context of his claims against the Kern County Superior Court is without merit because of the bar of the Eleventh Amendment.  He has no special relationship with the Kern County Superior Court.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

  Individual judges of the Kern County Superior Court are not defendants in this action.  Their actions as judicial officers performing their judicial duties are absolutely immune from liability.  Even if judges of the Kern County Superior Court "rubber-stamped those agents' decisions without giving Fritz an opportunity to cross-examine, etc." and that "Fritz had listed the Ca PC section 1368-1370 hearing and that the judge knew of an actual conflict and denied a Marsden motion, the functional equivalent of refusing to cure, which prejudiced Fritz where 'but for the constitutional errors, the result of the proceedings would have been different' (citation omitted) and/or 'prejudice per se' (citation omitted)."  Plaintiff's remedy was to appeal in the state civil and criminal cases.

26

  Judges and those performing judge-like functions are

absolutely free from liability for damages for acts performed in their official capacities. *Asheelman v. Pope*, 793 F.3d 1072 (9th Cir.1986). Judicial immunity applies no matter how "erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff." *Id.* at 1074. Judicial immunity is not affected "by the motives with which their judicial acts are performed." *Id.* at 1077. "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather he will be subject to liability only when he has acted in the clear absence of all jurisdiction." *Stump v. Sparkman*, 435 U.S. 349, 356-357 (1978). A judge is not immune from liability for damages if he performs an act that is not judicial in nature. *Asheelman*, 793 F.2d at 1075. An act is judicial in nature if it is a function normally performed by a judge. *Id.* To determine if the judge acted with jurisdiction, courts analyze whether the judge acted clearly beyond the scope of subject matter jurisdiction. *Id*.

A judge is not immune if a plaintiff seeks prospective injunctive relief. *Pulliam v. Allen*, 466 U.S. 522, 541 (1984).

Defendant Kern County Superior Court, responding to Plaintiff's arguments apparently seeking review of decisions and orders of the judges of the Kern County Superior Court, cites the *Rooker-Feldman* doctrine.

The *Rooker-Feldman* Doctrine was established in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia*

1   *Court of Appeals v. Feldman*, 460 U.S. 462 (1983).  As explained

2   in *Bianchi v. Rylaarsdam*, 334 F.3d 895, 898 (9th Cir. 2003),

3   *cert. denied*, 540 U.S. 1213 (2004):

4              Although the principal that federal courts
               lack jurisdiction to hear appeals from state
5              court decisions was firmly established in
               *Rooker v. Fidelity Trust Co.* ..., it was not
6              until ... *D.C. Court of Appeals v. Feldman*
               ... that the now-familiar test was
7              articulated:

8                    If the constitutional claims
                     presented to a United States
9                    District Court are inextricably
                     intertwined with the state court's
10                   denial in a judicial proceeding of
                     a particular plaintiff's
11                   application [for relief], then the
                     District Court is in essence being
12                   called upon to review the state
                     court decision.  This the District
13                   Court may not do.

14             ...

15                   United States District Courts ...
                     do not have jurisdiction, however,
16                   over challenges to state court
                     decisions in particular cases
17                   arising out of judicial proceedings
                     even if those challenges allege
18                   that the state court's action was
                     unconstitutional.

19             ...

20             *Rooker-Feldman* is a powerful doctrine that
21             prevents federal courts from second-guessing
               state court decisions by barring the lower
22             federal courts from hearing de facto appeals
               from state-court judgments.  If claims raised
23             in the federal court action are 'inextricably
               intertwined' with the state court's decision
24             such that the adjudication of the federal
               claims would undercut the state ruling or
25             require the district court to interpret the
               application of state laws or procedural
26             rules, then the federal complaint must be

                                   22

> dismissed for lack of subject matter
> jurisdiction ... Simply put, 'the United
> States District Court, as a court of original
> jurisdiction, has no authority to review the
> final determination of a state court in
> judicial proceedings.' ....

There is no legally cognizable claim assertable by Plaintiff that can be stated against the Kern County Superior Court.  The claims against the Kern County Superior Court are DISMISSED WITH PREJUDICE AND WITHOUT LEAVE TO AMEND.

C.   <u>DEFENDANTS PHILLIP BEGLIN AND DANA KINNISON</u>.

The SAC sues Public Defender Phillip Begelin and Public Defender Dana Kinnison in their personal capacities.  Defendants move to dismiss the SAC for failure to state a claim upon which relief can be granted.[2]

The only allegations in the SAC that appear to pertain to Defendants Begelin and Kinnison are as follows:

> 44) VI.  Factual paragraphs 133 through 136,
> 144-145, 168, 171, 173, 177-183, 185, 188,
> 191-198, 201-218, 223-227, 238-251, 253-254,
> 276-289, 286, 295, 299-300, 317-319, 326,
> 342, 344-346, 350-352, 354, 360-364, 372-378,
> 380-381, and 386 of docket entry # 5 are
> hereby incorporated by reference to this
> count/cause of action concerning Ineffective
> Assistance of Counsel Phil Begelin and Dana
> Kinnison.  Failure to Train, Control or
> Supervise Court Appointed Counsel by Kern
> County policy allowing Mr. Begelin and Mr.
> Kinnison's acts or edicts had been fairly
> seen to represent County of Kern policy,
> custom, or usage in the Taft and Lamont areas
> of the County, respectively, where that
> policy acts or omissions included:

---

[2]Although these Defendants moved to dismiss on the ground of improper service of process, at the hearing on February 25, 2008, Defendants expressly waived this ground for dismissal.

23

1.  - Conflict of Interest of Phil Begelin as
a matter of law and/or acts and failures
prejudicial to the Plaintiff's 14th 5th 6th and
9th Amendment rights were:

(a) PD Begelin did not move to
withdraw or for an appointment of
counsel in favor of competency
where he knew he was a defendant in
an [sic] habeas corpus writ
application at least one week
before and also during the actual
PC 1368 commitment trial and that
therefore his and Fritz's interests
were in conflict.

(b) - PD Begelin only ever asked
Fritz questions from Fritz's
'Answer' to a civil restraining
order and then apparently did not
believe Fritz's answers but also
failed in his duty to investigate
the facts upon which he based his
'amateur opinion' and which
influenced Judge Moench prejudicial
to Fritz liberty interest and
interest in proving his innocence
in the underlying criminal matter
where PD Begelin was not Fritz's
attorney, but forced onto Fritz for
the purposes of determining
incompetence to stand trial status
for the prosecution and the court
(Judge Moench) on January 10th,
2006.

(c) - On February 23rd, 2006 PD
Begelin went to court 'on reports'
against Fritz's wishes, never took
copies of said 'reports' for Fritz,
lied to Judge Phillips about
Fritz's wishes for a jury trial and
that Fritz did not want to talk to
him where PD Begelin never
attempted to talk with Fritz
between that date and the week
prior when he (PD Begelin) told
Judge Moench that he would go to
jury trial when Fritz informed
Judge Moench that PD Begelin was a
defendant in an application for a

24

writ of habeas corpus, and;

(d) - knew that two of the so-called 'specialists' had not given Fritz any 'Competency Assessment Tests' (CATS) and did he not [sic] stress that Fritz passed the evaluation which did give the procedurally and professionally required CAT's, and this was prejudicial to Fritz;

(e) - knew of but hid the evidence sent to him by Kern County Expert Promotion Center of Fritz having gone to Indonesia and Sri Lanka which PD Begelin apparently had previously not believed and had not investigated before his 'amateur opinion' of Fritz having 'grandiose delusions';

(f) - provided no 'adversarial process';

(g) - never asked Fritz questions designed to test whether Fritz understood the charges against him and/or how he was going to rationally defend against them;

(h) - did not make any motions provided for to establish Fritz's innocence or other motions provided for in the PC 1368 statute, and;

(i) - did not perform his duty to inform the Plaintiff of his right to appeal or help him to do so in those section 1368 proceedings.

45) PD Dana Kinnison not investigating the case after it was transferred to him where:

(a) - he didn't even talk with the Plaintiff prior to representing him,

(b) - did not advise the court of the limits of confinement according to PC 166(4)'s maximum period as

25

well as that even if Fritz would
have been convicted that he would
have only spent 90 days
incarcerated due to a first offense
status,

(c) - did not perform his duty to
advise Fritz of his appeal rights
or help him to do so in that
section 1368 context.

46) Kern County Public Defender's Office does
not train, control, or supervise their
subordinates in investigating negativing
evidence, even after Fritz having written a
note to that office early in the 1368
proceedings once Phil Begelin was forced onto
the Plaintiff, nor did the policymakers of
that office later answer Plaintiff's phone
requests or provide timely access to the
courts because of such training, control, or
supervisory policy failures or deliberate
indifference to their subordinate's acts or
edicts or failures to act or investigate.

Defendants complain that the use of the term "Attorney
Malpractice" and the use of the term "Ineffective Assistance of
Counsel" is ambiguous.  Attorney malpractice is a state cause of
action while ineffective assistance of counsel is a "[c]riminal
appellate defense."  Defendants assert:

Since Ineffective Assistance of Counsel is
clearly not a civil cause of action, PD
Defendants can have no civil liability.  In
the unlikely event that the Court is inclined
to equate apples and oranges, PD Defendants
[sic] liability is still absent based upon
the allegations of the SAC.  A review of the
SAC reveals that the allegations against the
identified Public Defenders are based upon
their alleged representation of Complainant
despite Complainant's desire to be
unrepresented.  The Public Defenders acted
under Court appointment, and according to
Complainant, the Public Defendant 'was not
[Complainant's] attorney, but [was] forced
onto [Complainant].' ....

26

1            Moreover, a cause of action for Attorney
          Malpractice is a state cause of action
2            traditionally unrelated to a § 1983 action.
          Here, the alleged Attorney Malpractice arises
3            from a set of facts separate and distinct
          from the § 1983 allegations.  Litigating this
4            unrelated state issue will consume an
          inordinate amount of judicial and trial time,
5            and will serve no useful purpose since the
          issue can independently be litigated in state
6            court.   PD Defendants respectfully request
          that the Attorney Malpractice cause of action
7            be dismissed, without prejudice, thereby
          allowing Complainant to re-file in state
8            court.

9      Defendants' position appears to be without merit.   In *Barner*

10  *v. Lords*, 24 Cal.4th 676 (2000), a public defender was sued for

11  legal malpractice by his client, who was wrongfully convicted of

12  bank robbery in a case of mistaken identity.   In pertinent part,

13  the California Supreme Court held:

14            Allegations of deficient performance by
          counsel ... are encountered routinely in
15            connection with claims of ineffective
          assistance of counsel made in the course of
16            appellate and collateral review of criminal
          convictions.   The Sixth Amendment confers a
17            right to the reasonably effective assistance
          of counsel acting '"within the range of
18            competence demanded of attorneys in criminal
          cases." ... The same standard of care
19            governing claims of ineffective assistance of
          counsel applies in a civil legal malpractice
20            action.

21  24 Cal.4th at 689.  Citing *Wiley v. County of San Diego*, 19

22  Cal.4th 532, 545 (1989), the *Barner* Court noted that "a deputy

23  public defender's exposure to liability for legal malpractice is

24  circumscribed by the requirement that a defendant in a criminal

25  action must prove his or her actual innocence by a preponderance

26  of the evidence before prevailing on a claim against his or her

1  attorney for negligent misrepresentation in the criminal

2  proceeding."  24 Cal.4th at 691.

3       It is not clear from the SAC that the claims against the

4  Public Defender Defendants are based solely on the state law

5  claim of legal malpractice.  If Plaintiff intended to sue these

6  Defendants under Section 1983, a public defender does not act

7  under color of state law when performing a lawyer's traditional

8  functions as counsel to a defendant in a criminal proceeding.

9  *Polk County v. Dodson*, 454 U.S. 312, 325 (1981).  *See Cox v.*

10  *Hellerstein*, 685 F.2d 1098 (9th Cir.1982):

11              In 1980, Cox filed a civil rights complaint
               alleging that Hellerstein and appellee James
12              F. Hewitt, Federal Public Defender, as
               Hellerstein's supervisor, violated Cox's
13              federally-protected rights during the course
               of Hellerstein's court-appointed
14              representation of Cox.  In his complaint, Cox
               alleged that Hellerstein was 'ineffective,
15              inadequate, incompetent, and unprofessional'
               as defense counsel.  Cox alleged that
16              Hellerstein failed to call witnesses who
               should have been called, worked for the
17              prosecution to obtain a conviction, and
               divulged confidential matters to the
18              prosecution.  The district court granted
               Hellerstein's motion to dismiss, and Cox
19              appeals.  We affirm on the ground that *Polk
               County v. Dodson*, 454 U.S. 312 ... (1981) is
20              controlling authority that the district court
               lacked subject matter jurisdiction over Cox's
21              civil rights action.

22  *See also Miranda v. Clark County, Nevada*, 319 F.3d 465, 468 (9th

23  Cir.), *cert. denied*, 540 U.S. 814 (2003).

24       The allegations of the SAC against these Defendants

25  establishes that neither were "state actors" for purposes of

26  Section 1983.

1     An otherwise private person acts "under color of" state law

2   when engaged in a conspiracy with state officials to deprive

3   another of federal rights.  *See Dennis v. Sparks*, 449 U.S. 24,

4   27-28 (1980); *Tower v. Glover*, 467 U.S. 914, 920 (1984).

5     The caption of the SAC alleges "Conspiracy to Violate Civil

6   Rights".  However, there are no allegations in the SAC from which

7   it may be inferred that either Defendant Begelin or Defendant

8   Kinnison conspired with any other state officials to deprive

9   Plaintiff of his federal rights.  Consequently, the SAC does not

10  state a claim upon which relief can be granted under Section 1983

11  against Defendants Begelin or Kinnison.  "To establish a

12  conspiracy, a plaintiff must demonstrate the existence of an

13  agreement or 'meeting of the minds' to violate constitutional

14  rights."  *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d

15  1283, 1301 (9th Cir.1999).  "The defendants must have, by some

16  concerted action, intended to accomplish some unlawful objective

17  for the purpose of harming another which results in damage."  *Id.*

18  This agreement or meeting of the minds may be inferred on the

19  basis of circumstantial evidence, such as the actions of the

20  defendants.  *Id.*  A showing that defendants committed acts that

21  'are unlikely to have been undertaken without an agreement' may

22  support the inference of a conspiracy.  *Id.*  Conclusory

23  allegations of conspiracy, however, are not enough to support a

24  Section 1983 conspiracy claim.  A plaintiff must allege specific

25  facts to support the existence of the claimed conspiracy.  *See*

26  *Olsen v. Idaho Bd. of Medicine,* 363 F.3d 916, 929 (9th Cir.2004).

29

1  Allegations that identify "the period of the conspiracy, the

2  object of the conspiracy, and certain other actions of the

3  alleged conspirators taken to achieve that purpose," *Marchese v.*

4  *Umstead*, 110 F.Supp.2d 361, 371 (E.D.Pa.2000), and allegations

5  that identify "which defendants conspired, how they conspired and

6  how the conspiracy led to a deprivation of his constitutional

7  rights," *Harris v. Roderick*, 126 F.2d 1189, 1196 (9th Cir.1997),

8  have been held to be sufficiently particular to properly allege a

9  conspiracy.

10     Defendants argue that the requirement in Rule 9(g), Federal

11  Rules of Civil Procedure, that items of special damage "shall be

12  specifically stated" has not been followed in the SAC.

13  Defendants refer to the prayer "for replacement of personal items

14  stolen and replacement or repair of vehicles damaged or by virtue

15  of sitting idle of 13,000 dollars" and "[o]ther compensatory/lost

16  income opportunity during such time of incarceration of 10,000.00

17  dollars."

18     "General damages typically are those elements of injury that

19  are the proximate and foreseeable consequences of the defendant's

20  conduct.  Special damages are those elements of damages that are

21  the natural, but not the necessary or usual, consequence of the

22  defendant's conduct, and typically stem from and depend upon the

23  particular circumstances of the case."  Wright & Miller, Federal

24  Practice and Procedure: Civil 3d § 1310, pp.346-347.  "Most

25  courts now take the position that allegations of special damage

26  will be deemed sufficient for the purpose of Rule 9(g) if they

30

1   are definite enough to enable the opposing party to prepare his

2   or her responsive pleading and a defense to the claim ...."  *Id.*,

3   § 1311, pp.354-355.  Plaintiff must describe the personal items

4   stolen and the vehicles damaged by vandalism or standing idle and

5   must specify the lost income opportunities lost during his

6   incarceration.

7        Defendants Begelin and Kinnison's motion to dismiss the SAC

8   is GRANTED WITH LEAVE TO AMEND.

9

10       D.  <u>DEFENDANT CRESTWOOD BEHAVIORAL HEALTH, INC.</u>.

11       The only allegations in the SAC that appear to pertain to

12  Defendant Crestwood Behavioral Health, Inc. are as follows:

13           30) III Paragraphs 263 through 386 of docket
             entry # 5 are hereby incorporated by
14           reference.  Crestwood Behavior [sic] Health,
             Inc., by and through its agents, employees,
15           spokespersons, and subcontractors Victoria
             Haner, Laura Collins, and Dr. Sanjay Vaswani,
16           along with Kern County actors Meghan Hamill
             and Kern County Patient's Rights Advocate's
17           Office, pursuant to Crestwood's policy of
             taking as true whatever they receive from the
18           court with respect to the charges against
             underlying M.I.S.T. clients as well as a
19           policy that eventually all clients are
             required to take medications, coupled with
20           Kern County's policy of holding M.I.S.T.
             clients at Crestwood for at least three to
21           six months from arrival, irrespective of
             whether they are determined to be ready for
22           court by Crestwood case managers, was the
             driving force or cause of compelling
23           defendant Crestwood agents to deny Fritz his
             rights (alternative or totality of the
24           circumstance's [sic] elements of this
             claim/count) as follows:
25
             31) I. 14th and 1st Amendment right to be
26           free from retaliation for:

                                31

(a) the exercise of his right to
free speech by requesting return to
court once he was certified by an
agent/case manager of Crestwood
according to professional standards
to do so;

(b) pointing out when Crestwood
employees and/or subcontractors
were violating the Patient's Bill
of Rights and/or their own rules
and/or instances pointin-out [sic]
various violations of clearly
established law being violated by
Kern County policy in Fritz's own
case, when Crestwood's agents
stated to get the Kern County
Patient's Rights Advocate to fill-
out [sic] an application for a writ
of habeas corpus or Public
Defender's Office, but then
conspired with the former and Kern
County Forensics Dr. Hamill in said
violation and chilled Fritz's
rights with the specter or [sic]
forced medication.

32) 2.  Access to the courts and right to
petition the government for the redress of
constitutional violations where. [sic] Fritz
was left in a position of reliance on
Crestwood to perform a duty to petition the
County of Kern Superior Court to discharge
the Plaintiff, when they knew to be the
normal course of one who was mistakenly
admitted and/or understood the charges
against him and how to rationally defend
against them and where rules for discharge
are clearly stated within Crestwood materials
given to the Plaintiff and within
professional standards and there was no
reasonable or rational basis for the denial
of access to the courts where transportation
to Lerdo law library or some other easy
and/or means of access could have been
provided.

33) Crestwood failed in this duty and
psychiatric standards when it falsely
imprisoned Fritz when they did not perform
such duty of discharge or petition the court

32

for such in a timely manner and psychiatric professional duty was deliberately disregarded by both the actors-employees as well as Crestwood due to their policy entwined with the Kern County CA policy of keeping M.I.S.T. clients at least three to six months prior to being certified by the County to return to court.

34) The force of this policy or usage between Kern County and Crestwood Omnicare [sic] is apposite [sic] to Adickes v. Kress & CO. [sic], 398 U.S. 144 (1970) and its progeny.

35) This policy agreement with the County of Kern CA was the driving force of Crestwood actors, agents, employees, and/or subcontractors in violating Fritz's rights by:

    (a) filing a petition for a medication order against the Plaintiff without first indicating that they wanted him to take any medication at all or attempt to consent.

    (b) this action was also malicious or intentional or a pretext as the stated actors would have had to have lied in order to be able to receive such an order and/or was done in spite of knowledge that the Plaintiff's pro per appeal was perfected against the same judge as they applied to for the medication order and;

    (c) was violative in other ways relating to the nature of the alleged offense's maximum period of confinement with respect to timing.

36) These actions were not only a violation of Ca PC 2900.6 and PC 1370 and is brought, in pari materia the 1st and 14th U.S. Constitutional Amendments' [sic] and case-law principles listed, as well as in the context of conspiracy to violate Fritz's 9th Amendment's right to bodily integrity and privacy, but also under Ca Civil Code §§ 43,

33

1    52.1(a)(b), 52.3, and Ca. Institutions Code
     §§ 5325(h)(i), 5325.1(c), 5326.3,
2    5326.5(b)(d), 5326.55: [sic]

3    37) Crestwood policy nexus with County of
     Kern CA and the coerced or conspired acts in
4    the furtherance thereof, including County of
     Kern's Patient's Right's Advocate's Office
5    [sic] visitors to Fritz where they were not
     supposed to have integral relations with the
6    treatment plan of the plaintiff, and have a
     chilling effect to the Plaintiff exercising
7    his 14th and 1st and 9th Amendment rights, as
     well as those listed or implicated within the
8    incorporated by referenced [sic] paragraphs
     and evidence in discovery, especially since
9    those professional standards and factual
     factors incorporated or listed above were
10   known or reasonably should have been known by
     the defendants but were disregarded and not
11   corrected by Crestwood hierarchy, whose care
     the Plaintiff was involuntarily placed into a
12   position to rely on Crestwood not to be
     entwined with the local government in
13   unconstitutional policies of this case of
     action parallel to the cases cited in Ruhlman
14   v. Ulster County Dept. of Social Services,
     234 F.Supp.2d 140 (N.D.N.Y.2002) and Ruhlman
15   v. Smith, 323 F.Supp.2d 356 (N.D.N.Y.2004) -
     as well as the conspiracy to violate the
16   maximum incarceration period of Ca PC 166(4)
     of Count IV.

17
        Crestwood argues that the SAC "fails to establish subject
18
matter jurisdiction" over it or to state a claim upon which
19
relief can be granted under Section 1983.  Crestwood contends
20
that, as a "private actor", it cannot be liable under Section
21
1983 unless Plaintiff pleads facts from which it may be inferred
22
that Crestwood deprived him of a right secured by the
23
Constitution and acted under color of state law.  *See Collins v.*
24
*Womancare*, 878 F.2d 1145, 1147 (9th Cir.1989), *cert. denied*, 493
25
U.S. 1056 (1999).
26

                                   34

"Whether a private party engaged in state action is a highly factual question ... Crucial is the nature and extent of the relationship between [the Defendant] and [the Bakersfield Police Department]." *Brunette v. Humane Society of Ventura County*, 294 F.3d 1205, 1209 (9th Cir.2002), *cert. denied*, 537 U.S. 1112 (2003). Three tests have developed to evaluate whether a private actor has engaged in state action. The "joint action" test examines whether private actors are willful participants in joint action with the government or its agents. *Id.*, at 1210. The "symbiotic relationship' test asks whether the government has so far insinuated itself into a position of interdependence with a private entity that the private entity must be recognized as a joint participant in the challenged activity. *Id.* The "public functions" test inquires whether the private actor performs functions traditionally and exclusively reserved to the States. *Id.* As explained in *Brunette*, in a symbiotic relationship:

> [T]he government has 'so far insinuated itself into a position of interdependence (with a private entity) that it must be recognized as a joint participant in the challenged activity.' *Burton*, 365 U.S. at 725 ... In *Burton*, for example, the Supreme Court found state action on the part of a privately-owned restaurant which refused to serve African-American customers. *Id.*, at 716 ... The restaurant was located in a public parking garage, benefitted from the Parking Authority's tax exemption and maintenance of the premises, and in turn, provided the Parking Authority with the income it needed to maintain fiscal viability. *Id.*, at 710-20 ... Although the Parking Authority had no part in the restaurant's discriminatory policies, the Court found that its relationship was one of

35

1
2
3

interdependence; the Parking Authority had placed its power, property, and prestige behind the restaurant's discrimination, and thereby had become a joint participant in that discrimination. *Id.,* at 725.

4
5
6
7
8
9
10
11
12
13

*Burton* teaches that substantial coordination and integration between the private entity and the government are the essence of a symbiotic relationship. Often significant financial integration indicates a symbiotic relationship ... For example, if a private entity, like the restaurant in *Burton*, confers significant financial benefits indispensable to the government's 'financial success,' then a symbiotic relationship may exist ... A symbiotic relationship may also arise by virtue of the government's exercise of primary control over the private party's actions. *See Dobyns v. E-Systems, Inc.,* 667 F.2d 1219, 1226-27 (5th Cir.1982)(finding symbiotic relationship where the government controlled a private peacekeeping force engaged in government-directed field mission in the Sinai Peninsula).

14  294 F.3d at 1213. With regard to the "public function" test,

15  *Brunette* explains:

16
17
18
19
20
21
22
23
24

Private activity becomes a 'public function' only if that action has been 'traditionally the exclusive prerogative of the State.' *Rendell Baker*, 457 U.S. at 841 ...; *see also Vincent*, 828 F.2d at 569 (finding repair of fighter jets a traditional function of the government, but not one of its exclusive prerogatives). If private actors hold elections ..., govern a town ..., or serve as an international peace-keeping force ..., they have been held responsible as state actors. On the other hand, it private actors educate 'maladjusted' youth ..., or resolve credit disputes, they have not been held to perform an exclusive prerogative of the State, and, thus, they have not been held responsible as state actors.

25  *Id.* at 1214. With regard to the "joint action" test, *Brunette*

26  explains:

36

1            **To be engaged in joint action, a private**
            **party must be a 'willful participant' with**
2            **the State or its agents in an activity that**
            **deprives others of constitutional rights ...**
3            **A private party is liable under this theory,**
            **however, only if its particular actions are**
4            **'inextricably intertwined' with those of the**
            **government ... A conspiracy between the State**
5            **and a private party to violate another's**
            **constitutional rights may also satisfy the**
6            **joint action test.**

7 **294 F.3d at 1211.   In *Degrassi v. City of Glendora*, 207 F.3d 636,**

8 **647 (9th Cir.2000), the Ninth Circuit explained:**

9            **... Under § 1983, a claim may lie against a**
            **private party who 'is a willful participant**
10           **in joint action with the State or its agents.**
           **Private persons, jointly engaged with state**
11           **officials in the challenged action, are**
           **acting 'under color' of law for purposes of §**
12           **1983 actions.'   *Dennis v. Sparks*, 449 U.S.**
           **24, 27-28 ... (1980).   However, a bare**
13           **allegation of such joint action will not**
           **overcome a motion to dismiss; the plaintiff**
14           **must allege 'facts tending to show that [the**
           **defendants] acted "under color of state law**
15           **or authority."'   *Sykes v. State of Cal.**
           *(Dep't. of Motor Vehicles)*, 497 F.2d 202 (9th
16           **Cir.1974).**

17 ***See also Sutton v. Providence St. Joseph Medical Center*, 192 F.3d**

18 **826, 834-836 (9th Cir.1999).**

19     **Crestwood argues that the SAC, when viewed in the most**

20 **liberal light, attempts to allege that Crestwood and Kern County**

21 **had similar policies in an attempt to show a conspiracy to**

22 **violate Plaintiff's constitutional rights but fails to adequately**

23 **allege that Crestwood was a willful participant with Kern County**

24 **officials to keep Plaintiff incarcerated.   Stating that Crestwood**

25 **had a policy which compelled it to deny his rights is a**

26 **conclusory statement.   Crestwood argues:**

Plaintiff's SAC provides no details of, or factual basis for, this alleged conspiracy between Crestwood and Kern County. Furthermore, it fails to demonstrate that there was a meeting of the minds between Crestwood and Kern County, a foundational requirement for such a claim ... Instead, plaintiff simply refers to two independent policies maintained by Crestwood and Kern County which he contends have a vague resemblance.  He suggests that the combined existence of these independent policies in itself constitutes a larger policy. Furthermore, he erroneously suggests that any independent, non-mandated or non-directed compliance by either entity with its own policy that may resemble, in whole or in part, the other's policy is done so at the direction of the other party and in furtherance of this supra policy plaintiff has concocted.  Plaintiff's conspiratorial diatribe fails to identify how, if at all, Crestwood conspired with Kern County in a manner or executed the conspiracy which might possibly constitute action under color of state authority by Crestwood.

At the hearing on February 25, 2008, Plaintiff explained his claims against Crestwood.  He argued that, after he had been at Crestwood for approximately three weeks pursuant to a court order, Crestwood evaluated him and stated that Plaintiff was competent to return to the Superior Court.  However, the County of Kern did not show up to interview Plaintiff to go back to court.  Plaintiff stated that he tried without success to contact an attorney representing Crestwood to advise the attorney that Crestwood was entwined with the County's alleged policy of keeping persons at Crestwood past the return date to court, past the maximum sentence, and that Crestwood was entwined with the County's alleged policy when Crestwood keeps persons committed to

38

the facility for three to six months, no matter if the person is ready to return to court or not.  Plaintiff argued that Crestwood's duty was to "get their lawyer on it" and that "[n]o attorney for Crestwood was ever assigned to Crestwood to train these people into not entwining themselves into this type of policy until I filed the litigation."  Plaintiff stated that Crestwood employees told him that the County does not work for Crestwood and that they can't make the County come out to interview Plaintiff to return to court.

Plaintiff's allegations suggest that Crestwood was acting for its own purpose to allegedly keep County mental health patients longer than necessary.  It is not alleged that the County had any participation in or could benefit from Crestwood's alleged prolonged holding of County defendants.  Crestwood was acting under contract with the County and impliedly the County and Crestwood had a duty to timely review the status of mental health detainees and return them to court have a determination of competency decided.  This claim is best addressed by summary judgment.  The SAC may state a claim against Crestwood if Plaintiff Plaintiff complies with Rule 8 and this Memorandum Decision.

Crestwood's motion to dismiss is GRANTED WITH LEAVE TO AMEND.


E.   DEFENDANT PHILIP GARZA.

Kern County Sheriff's Department Deputy Philip Garza moves

39

to dismiss the SAC for failure to state a claim upon which relief can be granted.[3]

In Plaintiff's opposition to Defendant Garza's motion to dismiss the SAC, Plaintiff concedes that the only claim against Defendant Garza is set forth in "Count I".  "Count I" alleges:

> 11) I.  Paragraphs 8 through 123 and paragraphs 139-140, 145-149, 153, 158-159, 161-162, 167, 170, 172, 200, 234, 250 and 256 of docket entry # 5 are hereby incorporated by reference.  County of Kern Sheriff's Department Failure to Train, Supervise and/or Control/Retaliation-Chilling Effect/Turning a Blind Eye/Probable Cause slippery-slope where Cmdr. Randy Turman, Sgt. Camps, and Sgt. Winnery personally knew of the arresting officer's (Deputy Wright's) propensities for writing inaccurate reports with respect to Fritz, but recklessly, intentionally, or by gross negligence or with deliberate indifference to Fritz's 14th and 1st Amendments' [sic] rights allowed and approved Deputy Wright's writing false and/or ambiguous reports concerning Fritz in retaliation for, or to chill Fritz's assertion of, those rights to complain about such deputies and/or policies in the past where:

> 12) the actual report of the arresting Deputy Wright contained 26 anomalies, outright falsities, or points of contention and was written at the same time (December 13th, 2005 - 3 days after the alleged event) as the second probable cause declaration of Deputy Garza's probable cause affidavit, which was:

> 13) substantially different from Deputy Wright's first probable cause declaration of December 10th, 2005 and the subsequent police report of Deputy Wright, where Fritz does not own an 'ATV' vs. earlier probable cause

---

[3]Defendant Garza moved to dismiss the SAC for insufficiency of service of process but expressly waived that ground for dismissal at the hearing on February 25, 2008.

affidavit of arresting deputy [sic] Wright
stating 'BMW' and the second probable cause
affidavit was, in the incorporated by
reference paragraphs and materials, an
embellishment of even Deputy Wright's false
report where Deputy Wright knew of but
disregarded that Fritz:

   a) was on two different roads vs.
   water tower road only;

   b) admits east of park south-side
   of town but a simple map shows road
   to water tower is north of park;

   c) didn't look at the scene of
   allegations to see valley (or two)
   and distance layout even if Fritz
   was on 'water tower' road, it is
   farther south than where alleged
   victim was located;

   d) slippery slope conclusion
   between 'seeing' each other and
   'being within' prescribed distance
   and;

14) Deputy Wright and Deputy Garza's probable
cause affidavits and report factual
circumstances were contradicted in favor of
the Plaintiff at the restraining order
hearing by the alleged victim on December
13th, 2005, where all of these persons turned
a blind eye for fear of what they would see
or with deliberate indifference to the truth
and where they did not believe the Plaintiff
to be guilty.

   ...

16) This spirit of animosity condoned by said
supervisors reached its zenith in pari
materia the context of the allegations of the
alleged violation of the temporary
restraining order/PC 166(4) contempt of court
charge on Dec. 10th, 2005 and subsequent
positive injuries and causing Fritz to be
subjected to other Kern County
constitutionally violative policies.

17) The climate produced by these supervisors

41

allowed their junior officers to effect conclusory probable cause affidavits and to have one officer write a false probable cause affidavit from another officer's report in an attempt to insulate the initial affiant but where the second probable cause affidavit writer Deputy Garza 'except[ed]' to everything with respect to personal belief in swearing as to the truth or falsity of that which was relied on in writing that second probable cause affidavit.

18) These supervisors do not train their junior officers that a ten year old child whom they had only known from when they spoke with him about not riding illegal motorcycles on the street and/or around Fritz's house, is not a 'previously trustworthy or reliable witness', nor do these supervisors train their junior officers how to question such class of persons to protect the innocent public from false charges.

19) These supervisors do not also train their junior officers that a proper service of process with respect to restraining order 'Answer' is not a violation of a temporary restraining order.

20) This training or supervisory failure was personally approved by Sgt. [sic] Winnery and he allowed Deputy Garza to charge Fritz with a violation of the temporary restraining order after he was arrested, and which influenced the prosecutor ADA Ingrum in that he intended to use the second false allegation as additional evidence.

...

25) Other events since that time includes a false accusation on or about February 12th, 2007 where minimal detention then release was performed after an adequate investigation as well as a false accusation on August 11th, 2007, the latter of which is ongoing and the arresting officer was Deputy Garza whose propensities to write false probable cause affidavits, etc. are alleged to have been known from the past event and more recently by the present supervisors Chief Wahl and

42

1      Sgt. Downs.

2          26) The present supervisors also know the
           present events' solicitation of a conspiracy
3          with private actors by Deputy Garza in
           retaliation for Plaintiff's exercising his
4          1st and 14th Amendments' [sic] rights to
           report disturbances of the peace and
5          intimidation of Fritz for having done so
           early Saturday morning the 11th of August,
6          2007 and the falsities or omissions within
           police report SR07-27926 by that deputy and
7          another deputy's reliance on that false
           information to write three four false charges
8          from that report.

9      In opposing the motion to dismiss, Plaintiff asserts:

10         Fritz previously only had a badge number
           (#917) and illegible [worthy of handwriting
11         analysis] signatures of this defendant from
           the first incident where Fritz had not
12         previously met Garza until August 11th of
           2007, the early morning hours of Saturday
13         when [falsely] arrested by him.

14     In his reply brief, Defendant Garza states that, until the

15  opposition was filed, it was believed that the SAC alleged

16  Garza's involvement in the 2005 arrest was one of the primary

17  issues in this litigation.  Now Garza asserts that "[i]n addition

18  to the recent arrest, the SAC alleges that Garza prepared a

19  probable cause affidavit at an unknown time."  With regard to the

20  allegations in the SAC concerning the August 2007 arrest, Garza

21  cites *Heck v. Humphrey*, 512 U.S. 477 (1994) and *Wallace v. Kato*,

22  ___ U.S. ___, 127 S.Ct. 1091 (2006).

23     In *Wallace v. Kato*, the Supreme Court, with regard to false

24  arrest, held that such a claim requires "detention without legal

25  process" and accrues once legal process is initiated.  127 S.Ct.

26  at 1095.   The Supreme Court, limiting the *Heck* deferred accrual

43

1  rule, held that, regardless of subsequent events, the statute of
2  limitations for false arrest claims begins to run when a claimant
3  is wrongfully detained pursuant to the legal process.  127 S.Ct.
4  at 1100.  *Heck* does not toll the statute of limitations.  The
5  Supreme Court specifically rejected the argument that the statute
6  of limitations for false arrest begins only after "an anticipated
7  future conviction ... occurs and is set aside."  *Id.* at 1098.
8  The Supreme Court explained that "[i]f a plaintiff files a false
9  arrest claim before he was convicted (or files any other claim
10 related to rulings that will likely be made in a pending or
11 anticipated criminal trial), it is within the power of the
12 district court, and in accord with common practice, to stay the
13 civil action until the criminal case or the likelihood of the
14 criminal case is ended.  If the plaintiff is ultimately
15 convicted, and if the stayed civil suit would impugn that
16 conviction, *Heck* will require dismissal; otherwise, the civil
17 action will proceed, absent some other bar to suit."  *Id.* at
18 1098.

19      Based on *Wallace*, Garza requests that the SAC be dismissed
20 against him without prejudice or that the action be stayed as
21 against him pending resolution of the 2007 criminal matter.

22      Although not clearly articulated, the SAC alleges that
23 Defendant Garza prepared a second probable cause affidavit in
24 connection with the 2005 criminal proceedings against Plaintiff.

25      It is not clear that the SAC asserts a claim against Garza
26 and the County of Kern with regard to the allegations about the

1   2007 arrest for disturbing the peace.  If Plaintiff intends to

2   allege claims for relief based on the 2007 arrest, Plaintiff must

3   clearly so allege so that the Court can determine whether to

4   exercise its discretion to stay those claims pending the outcome

5   of any criminal proceeding based on that arrest.  The SAC is so

6   unclearly and confusingly alleged that it is very difficult to

7   ascertain exactly what Plaintiff is alleging.  With regard to the

8   allegations against Defendant Garza asserting a 2005 probable

9   cause determination based on false statements by the deputy, the

10  SAC may state a claim if Plaintiff complies with Rule 8 and this

11  Memorandum Decision.

12      Defendant Garza's motion to dismiss is GRANTED WITH LEAVE TO

13  AMEND.

14      F.  **DEFENDANT COUNTY OF KERN.**

15      The allegations in the SAC against Defendant County of Kern

16  are as follows:

17          11) I.  Paragraphs 8 through 123 and
            paragraphs 139-140, 145-149, 153, 158-159,
18          161-162, 167, 170, 172, 200, 234, 250 and 256
            of docket entry # 5 are hereby incorporated
19          by reference.  County of Kern Sheriff's
            Department Failure to Train, Supervise and/or
20          Control/Retaliation-Chilling Effect/Turning a
            Blind Eye/Probable Cause slippery-slope where
21          Cmdr. Randy Turman, Sgt. Camps, and Sgt.
            Winnery personally knew of the arresting
22          officer's (Deputy Wright's) propensities for
            writing inaccurate reports with respect to
23          Fritz, but recklessly, intentionally, or by
            gross negligence or with deliberate
24          indifference to Fritz's 14th and 1st
            Amendments' [sic] rights allowed and approved
25          Deputy Wright's writing false and/or
            ambiguous reports concerning Fritz in
26          retaliation for, or to chill Fritz's

45

assertion of, those rights to complain about such deputies and/or policies in the past where:

12) the actual report of the arresting Deputy Wright contained 26 anomalies, outright falsities, or points of contention and was written at the same time (December 13th, 2005 - 3 days after the alleged event) as the second probable cause declaration of Deputy Garza's probable cause affidavit, which was:

13) substantially different from Deputy Wright's first probable cause declaration of December 10th, 2005 and the subsequent police report of Deputy Wright, where Fritz does not own an 'ATV' vs. earlier probable cause affidavit of arresting deputy [sic] Wright stating 'BMW' and the second probable cause affidavit was, in the incorporated by reference paragraphs and materials, an embellishment of even Deputy Wright's false report where Deputy Wright knew of but disregarded that Fritz:

   a) was on two different roads vs. water tower road only;

   b) admits east of park south-side of town but a simple map shows road to water tower is north of park;

   c) didn't look at the scene of allegations to see valley (or two) and distance layout even if Fritz was on 'water tower' road, it is farther south than where alleged victim was located;

   d) slippery slope conclusion between 'seeing' each other and 'being within' prescribed distance and;

14) Deputy Wright and Deputy Garza's probable cause affidavits and report factual circumstances were contradicted in favor of the Plaintiff at the restraining order hearing by the alleged victim on December 13th, 2005, where all of these persons turned a blind eye for fear of what they would see

46

or with deliberate indifference to the truth
and where they did not believe the Plaintiff
to be guilty.

15) These supervisors condoned a spirit of
animosity towards the Plaintiff for having

    (a) complained about the arresting
    officer within the six months prior
    to arrest, and participated in and
    facilitated retaliation against
    Fritz for petitioning them for
    redress concerning those
    incorporated by reference events
    and documents, as well as;

    (b) the general climate of turning
    a blind eye to the Derby Acres
    disturbances of the peace,
    disorderly conduct, fighting words,
    assault and battery and/or
    attempted intimidation of a witness
    to the aforementioned criminal
    activities' [sic] occurrences, and

    (c) suggested to the law-breakers
    to file restraining order on Fritz
    for his protected or innocent
    activities.

16) This spirit of animosity condoned by said
supervisors reached its zenith in pari
materia the context of the allegations of the
alleged violation of the temporary
restraining order/PC 166(4) contempt of court
charge on Dec. 10th, 2005 and subsequent
positive injuries and causing Fritz to be
subjected to other Kern County
constitutionally violative policies.

17) The climate produced by these supervisors
allowed their junior officers to effect
conclusory probable cause affidavits and to
have one officer write a false probable cause
affidavit from another officer's report in an
attempt to insulate the initial affiant but
where the second probable cause affidavit
writer Deputy Garza 'except[ed]' to
everything with respect to personal belief in
swearing as to the truth or falsity of that
which was relied on in writing that second

47

probable cause affidavit.

18) These supervisors do not train their junior officers that a ten year old child whom they had only known from when they spoke with him about not riding illegal motorcycles on the street and/or around Fritz's house, is not a 'previously trustworthy or reliable witness', nor do these supervisors train their junior officers how to question such class of persons to protect the innocent public from false charges.

19) These supervisors do not also train their junior officers that a proper service of process with respect to restraining order 'Answer' is not a violation of a temporary restraining order.

20) This training or supervisory failure was personally approved by Sgt. [sic] Winnery and he allowed Deputy Garza to charge Fritz with a violation of the temporary restraining order after he was arrested, and which influenced the prosecutor ADA Ingrum in that he intended to use the second false allegation as additional evidence.

21) Kern County policymaker advisors Kern County Counsel John Erby also knew of Fritz's complaints about Deputy Wright's propensities and probable animosity against Fritz, as well as thereafter: Kern County Sheriff's Department Internal Affairs Division, Kern County Board of Supervisors and at least Judge Moench and Judge Kelley, knew of this fact as well as some of the Franks v. Delaware probable cause affidavit correction test evidence, within the said incorporated-by-reference paragraphs and their incorporated evidence and more, to be shown upon further discovery, and continued to do nothing even after the March 10th, 2006 or June 10th, 2006 date(s) in which Fritz would have been released even if he would have lost at any trial.

22) These policy failures caused the special damages positive injury to Fritz in allowing the public to help themselves to Fritz's personal and business possessions in and

around his house where the junior officers on patrol would turn a blind eye when Fritz's house was plainly seen to have been broken into and they knew Fritz was incarcerated.

23) The chilling effect and positive injuries resulted from this failure to train, control, and/or supervise and was the proximate cause of the Plaintiff's injuries and which subjected Fritz to the other County policymaker's acts or edicts and/or causes of actions' violations.

24) It is believed and averred that such supervision faults have or will more likely than not result in others' civil rights violations which could have reasonably been prevented by these supervisors by constitutionally adequate training in the afore-mentioned areas of well-established 1st, 4th and 14th Amendment law.

25) Other events since that time includes a false accusation on or about February 12th, 2007 where minimal detention then release was performed after an adequate investigation as well as a false accusation on August 11th, 2007, the latter of which is ongoing and the arresting officer was Deputy Garza whose propensities to write false probable cause affidavits, etc. are alleged to have been known from the past event and more recently by the present supervisors Chief Wahl and Sgt. Downs.

26) The present supervisors also know the present events' solicitation of a conspiracy with private actors by Deputy Garza in retaliation for Plaintiff's exercising his 1st and 14th Amendments' [sic] rights to report disturbances of the peace and intimidation of Fritz for having done so early Saturday morning the 11th of August, 2007 and the falsities or omissions within police report SR07-27926 by that deputy and another deputy's reliance on that false information to write three four false charges from that report.

27) II Paragraphs 141 through 143, 151, 186-187, 189-190, 199, 221-222, 228-233, 235-236,

49

252, 256-257, and 259-260 of docket entry # 5 are hereby incorporated by reference. Deliberate indifference to prisoner's serious medical needs where Kern County 'Lerdo' Pretrial Facility's doctor (whose name is unknown), as gatekeeper, failed to give Fritz timely x-rays with respect to a back injury suffered while at Lerdo.

28) Apparently it is a policy to not approve such tests due to its cost and such policy was the driving force behind said 14th Amendment violation and the Plaintiff's continued constant arthritic-like pain when an operation of T-5 and T-6 in Fritz's spine was performed too late, was not complete in that the fracture to T-1 was never repaired and there was never any physical therapy.

29) Plaintiff Fritz also suffered chronic pain and the threat of paralysis for approximately 3 (three) months after the gatekeeper knew or reasonably could have known of Fritz's condition within 1 (one) month, and are the proximate cause of the Plaintiff's previous and continuing pain from the delayed and incomplete operation either by that gatekeeper and/or the County of Kern CA. in its denial of the state claim supplement for which this action was filed within six months release of incarceration.

30) III Paragraphs 263 through 386 of docket entry # 5 are hereby incorporated by reference.  Crestwood Behavior Health, Inc., ... along with Kern County actors Megham Hamill and Kern County Patient's Rights Advocate's Office, pursuant to Crestwood's policy of taking as true whatever they receive from the court with respect to the charges against underlying M.I.S.T. clients as well as a policy that eventually all clients are required to take medications, coupled with Kern County's policy of holding M.I.S.T. clients at Crestwood for at least three to six months from arrival, irrespective of whether they are determined to be ready for court by Crestwood case managers, was the driving force or cause of compelling defendant Crestwood agents to deny Fritz his rights (alternative or totality of

the circumstance's elements of this
claim/count ....

...

33) Crestwood failed in this duty and
psychiatric standards when it falsely
imprisoned Fritz when they did not perform
such duty of discharge or petition the court
for such in a timely manner and psychiatric
professional duty was deliberately
disregarded by both the actors-employees as
well as Crestwood due to their policy
entwined with the Kern County CA policy of
keeping M.I.S.T. clients at least three to
six months prior to being certified by the
County to return to court.

34) The force of this policy or usage between
Kern County and Crestwood Omnicare
is apposite to Adickes v. Kress & CO., [sic] 398
U.S. 144 (1970) and it's progeny.

...

38) IV.  Paragraphs 245 through 251, 253-254,
and 261-387 of docket entry # 5 are hereby
incorporated by reference.  Equal Protection
under the 14th Amendment.  Fritz, as a 'class
of one' under *Village of Willowbrook v.
Olech*, 528 U.S. 562 (2000) ... and *Valley
Outdoor, Inc. v. City of Riverside*, 446 F.3d
948, 955 (9th Cir.2006) in that he was denied
equal protection by Kern County's policy,
custom, or usage of both the Ca PC §§ 1368-
1370.01(c)(1)(A) as well as Ca PC § 166(4)
state law statutes in treating Fritz
differently from similarly situated persons,
whereby Ca PC 166(4) carries only a 6 month
sentence (180 days) maximum and Fritz was
incarcerated for 9 months (270 days) and
there was no rational basis for the
difference in treatment where state law
creates a liberty interest under such
apposite cases as Wolf v. McDonnell, 418 U.S.
539, 57 [sic] (1974) and Gerstein v. Pugh,
420 U.S. 103 .... (1975) and;

39) that 180 day maximum would have been
reduced to 90 days due to any unlikely
conviction would have been considered a

51

'first offense' eligible for 'half time' under California law.

40) This was also considered to be an equal protection violation on the basis of wealth where Fritz had not bailed himself out due to circumstances before the PC 1368 proceedings.

...

42) V.  Paragraphs 140, 148-150, 153 of docket entry # 5 are hereby incorporated by reference.  Procedural Due Process violations of the 14th Amendment as well as in the context of the 5th Amendment.

43) Kern County's policy, custom, or usage of both the Ca PC §§ 1368-1370 as well as Ca PC § 166(4) state law statutes in that the County's policy, custom, or usage did not comport with the well-established law with respect to the nature and duration of confinement, which bore no reasonable relation to its purpose under *Jackson v. Indiana,* 406 U.S. 715, 738 (1972), and were the cause of the 14th, 5th, 6th and 9th Amendment's violations against Fritz and is responsible for the subsequent and natural damages requested and where the relevant policymaking officials were informed by Fritz during the respective time periods before, during, and/or a reasonable time after such violations against well-established law in similar circumstances such as Zinermon v. Burch, 494 U.S. 113 (1990) in the Ca PC 1368-1370 context, but unreasonable determination of the facts and no investigation into how even matters of law should have been seen to violate the Plaintiff's liberty, privacy, and procedural due process interests, thereby also causing a loss of his property interests where said policy, custom, or usage was also against the CA state's interest to get an accused to trial and CA state and federal constitutional protections under said well-established law.

...

46) Kern County Public Defender's Office does not train, control, or supervise their

52

subordinates in investigating negativing evidence, even after Fritz having written a note to that office early in the 1368 proceedings once Phil Begelin was forced onto the Plaintiff, nor did the policymakers of that office later answer Plaintiff's phone requests or provide timely access to the courts because of such training, control, or supervisory policy failures or deliberate indifference to their subordinate's acts or edicts or failures to act or investigate.

47) The Kern County policy of not training, controlling and/or supervising their subordinates prejudiced Fritz by allowing their subordinates in this case to act irrationally and arbitrary [sic] and to hide evidence favorable to the Plaintiff's liberty interest and the interest to be free of stigma, plus their attached detrimental effects, and which policy failures were the proximate cause of Fritz's prolonged pretrial incarceration and allowed the constitutionally violative acts or omissions listed herein of the individual defendants.

48) VII.  Paragraphs 3 through 421 and the materials referenced therein of docket entry # 5 are hereby incorporated by reference herein.  Substantive Due Process.  Violation against County of Kern Superior Court System

What happened to Plaintiff Fritz, where the included paragraphs show a pattern or policy, whether associated with only the Plaintiff or upon further discovery it can be seen that Kern County and Crestwood has performed the well-established law violations on others as well.

49) In addition to the above causes of action/counts, this substantive due process violation result is also requested in the totality of the circumstances for:

I. - Superior Court of the County of Kern, Taft-Lamont Division's granting a civil restraining order to the first person who reached the courthouse; even in the face of evidence at the hearing or innocent or protected activity or no harassment in the

53

respective sense that it was happenstance and/or the product of fabrication via paranoia or projection or malice, and where Mr. Martin was allowed to rest on the laurels of his [initial] pleading without proving such allegations;

2. - Kern County Child Protective Services not investigating children whose parents condoned and encouraged them to break the law and where such child(ren) ultimately injured the Plaintiff;

3. - Superior Court of the County of Kern allowing conclusory, unreliable, untrustworthy, conflicting, ambiguous and/or outright false and/or slippery-slope and conclusory allegations to count as probable cause, without independent judicial review of the executive branch's decision and without allowance of a Franks v. Delaware type of hearing even after habeas corpus writ application evidence;

4. - Superior Court of the County of Kern punishment or bias against Fritz for exercising his 6th Amendment right to represent himself under Faretta and its progeny;

5. - 6th Amendment violation policy where County of Kern Superior Court System did not allow confrontation with the witnesses against him in both the:

    a. - PC 166(4) underlying criminal charge context;

    b. - PC 1368 context

6. - Superior Court of California, County of Kern allowing prosecutorial misconduct and subversion or prosecutorial vouching in getting off the subject with respect to how the 'Answer' to the restraining order was served, to instead that of the contents of that properly served 'Answer', where it had little or nothing to do with the criminal charge;

7. - County of Kern's policy of allowing the

prosecuting attorney of attempting to introduce additional evidence of a properly served 'Answer' to a Restraining Order 'Request' against a defendant without consulting 'proof of service' filings in the record.

8. - bias or prejudice (in the relevant incorporated paragraphs) of the County of Kern Superior Court's judges involved vexatiously multiplied the proceedings.

9. - County of Kern's policymakers of that [Taft] area conspiring to persuade the Superior Court of the County of Kern to afford no adversarial process to be allowed to determine the truth in both PC 166(4) and PC 1369 contexts;

10. - the County of Kern Superior Court's judges involved not providing Fritz with a means to clear his name/establish his innocence otherwise provided for under well-established law (since 1972) in the PC 1368 context such as Jackson v. Indiana, 406 U.S. -, 92 S.Ct. 1845;

II. - using the 1368 process for an improper purpose such as:

     a.  punishment or purposes unrelated to whether Fritz understood the charges against him and how to rationally defend against them, and;

     b.  where Fritz asserted innocence and did not take the plea bargain of 19 days, etc., retaliation for the exercising of the 6th Amendment's [sic] right to go to jury trial;

12. - 'speedy trial' issues not addressed in Pederson v. Superior Court, 130 Cal.Rptr.2d 289, but can be shown under the Barker v. Wingo standards;

13. - County of Kern hiring 'specialists' in the PC 1368 context who do not give the statutorily and professionally required CAT's

1          [sic].

2              50) These actions and associated causes-of-
           action/counts' factual predicates of the
3          course of events shocks the conscience of any
           reasonable person and/or which the Plaintiff
4          or any other person should never have had to
           have endured and for which Fritz suffered the
5          prolonged pretrial incarceration damages
           spoken of in Gerstein v. Pugh, 420 U.S. 103
6          ... (1975) and physical back sufferings,
           emotional stress, and stigma-plus
7          circumstances where Fritz's visa into the
           countries he has already traveled or plans to
8          travel may be denied as a result of the
           County of Kern's classifying him as a recent
9          former mental health patient.

10     In *Monell v. New York City Dept. of Social Services*, 436

11 U.S. 658, 692 (1978), the Supreme Court limited a local

12 government's liability under Section 1983 to those cases where

13 "some official policy 'causes' an employee to violate another's

14 constitutional rights."

15             [A] local government may not be sued under §
           1983 for an injury inflicted solely by its
16         employees or agents.  Instead, it is when
           execution of a government's policy or custom,
17         whether made by its lawmakers or by those
           whose edicts or acts may fairly be said to
18         represent official policy, inflicts the
           injury that the government as an entity is
19         responsible under § 1983.

20 *Id.* at 694.  Since "Congress did not intend municipalities to be

21 held liable unless action pursuant to official municipal policy

22 of some nature caused a constitutional tort[,] ... a municipality

23 cannot be held liable solely because it employs a tort feasor -

24 or, in other words, a municipality cannot be held liable under §

25 1983 on a respondeat superior theory."  *Id.* at 691.  A

26 municipality will be held liable under § 1983 only if "the

municipality itself causes the constitutional violation at issue." *Canton v. Harris*, 489 U.S. 378, 385 (1989). "City policy 'causes' an injury where it is 'the moving force' behind the constitutional violation ... or where 'the city itself is the wrongdoer." *Chew v. Gates*, 27 F.3d 1432, 1444 (9th Cir.1994). However, "[c]ity policy 'need only cause [the] constitutional violation, it need not be unconstitutional per se.'" *Id.* To prevail in a civil rights claim against a local government under *Monell*, a plaintiff must satisfy a three-part test:

> (1) The local government official(s) must have intentionally violated the plaintiff's constitutional rights;
>
> (2) The violation must be a part of policy or custom and may not be an isolated incident; and
>
> (3) There must be a link between the specific policy or custom to the plaintiff's injury.

*Id.* at 690-92. There are a number of ways to prove a policy or custom of a municipality. A plaintiff may show (1) "a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity;" (2) "the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision;" or (3) "the official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005). The Ninth Circuit has held that a municipal policy "may be inferred from widespread practices or evidence of repeated

57

constitutional violations for which the errant municipal officers were not discharged or reprimanded."  Id.

A municipality may still be liable under *Monell* for a single incident where: (1) the person causing the violation has "final policymaking authority;" (2) the "final policymaker" "ratified" a subordinate's actions; or (3) the "final policymaker" acted with deliberate indifference to a subordinate's constitutional violations.  *Christie v. Iopa*, 176 F.3d 1231 (9th Cir. 1999).It is well established in the Ninth Circuit that an allegation based on nothing more than a bare averment that the official's conduct conformed to official policy, custom or practice suffices to state a *Monell* claim under Section 1983.  *See Karim Panahi v. L.A. Police Dept.*, 839 F.2d 621, 624 (9th Cir. 1988); *Shah v. County of L.A.*, 797 F.2d 743, 747 (9th Cir. 1986); *Guillory v. County of Orange*, 731 F.2d 1379, 1382 (9th Cir. 1984).

A municipality's failure to train an employee who has caused a constitutional violation can be the basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the employee comes into contact. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  The issue is whether the training program is adequate and, if it is not, whether such inadequate training can justifiably be said to represent municipal policy.  *Id.* at 390.  Municipal liability for failure to train may be imposed even where trained professionals, such as lawyers or doctors are involved.  *Long v. County of Los Angeles*, 442 F.3d 1178, 1187-1188 (9th Cir.2006); *Miranda v.*

58

*Clark County*, 319 F.3d 465, 471 (9th Cir.), *cert. denied*, 540
U.S. 814 (2003).

"Policies of omission regarding the supervision of employees
... can be 'policies' or 'customs' that create municipal
liability under *Monell*, but only if the omission 'reflects a
"deliberate" or "conscious" choice' to countenance the
possibility of a constitutional violation." *Gibson v. County of
Washoe, Nev.,* 290 F.3d 1175, 1194 (9th Cir.2002), *cert. denied*,
537 U.S. 1106 (2003).

There are allegations in the SAC from which it may be
inferred that Plaintiff is seeking to hold the County of Kern
liable for alleged constitutional violations by Kern County
District Attorneys.

To hold a local government liable for an official's conduct,
a plaintiff must first establish that the official 1) had final
policymaking authority "concerning the action alleged to have
caused the particular constitutional or statutory violation at
issue" and 2) was the policymaker for the local governing body
for the purposes of the particular act. *McMillian v. Monroe
County, Alabama*, 520 U.S. 781, 785 (1997). State law defines the
official's "actual function...in a particular area" for section
1983 purposes and this function must be evaluated to determine
whether he or she acts for the state or county. *Id.* at 786. In
*Pitts v. County of Kern*, 17 Cal.4th 340 (1998), the California
Supreme Court concluded that a district attorney acts on behalf
of the state rather than the county in preparing to prosecute

crimes and in training and developing policies for prosecutorial
staff. *Pitts* involved section 1983 claims brought against Kern
County, its district attorney and employees by persons convicted
of child molestation whose convictions were reversed on appeal.
The Ninth Circuit has also concluded that "under California law a
county district attorney acts as a state official when deciding
whether to prosecute an individual. *Weiner v. San Diego County*,
210 F.3d 1025, 1030 (9th Cir. 2000). Therefore, to the extent
that the SAC attempts to impose Section 1983 liability on the
County of Kern for decisions of the prosecutors, the SAC does not
state a claim against the County upon which relief can be
granted. These claims are DISMISSED WITH PREJUDICE AND WITHOUT
LEAVE TO AMEND.

The same conclusion is reached to the extent that the SAC
seeks to impose Section 1983 liability on the County of Kern for
the actions or inactions of judges of the Kern County Superior
Court. Judges of the Superior Courts of the State of California
are not employed by or agents of the County of Kern. The acts or
omissions of judges of the Superior Courts of the State of
California do not represent an allegedly unconstitutional policy
or practice of the County of Kern. *See Franceschi v. Schwartz,*
57 F.3d 828, 831 (9th Cir.1995). These claims are DISMISSED WITH
PREJUDICE AND WITHOUT LEAVE TO AMEND.

The balance of the allegations against the County of Kern
upon which *Monell* liability might be predicated appear to state a
claim upon which relief can be granted as the alleged unjustified

60

detention claim, assuming Plaintiff's compliance with Rule 8 and this Memorandum Decision.  It is well established in the Ninth Circuit that an allegation based on nothing more than a bare averment that the official's conduct conformed to official policy, custom or practice suffices to state a *Monell* claim under Section 1983.  *See Karim Panahi v. L.A. Police Dept.*, 839 F.2d 621, 624 (9th Cir. 1988); *Shah v. County of L.A.*, 797 F.2d 743, 747 (9th Cir. 1986); *Guillory v. County of Orange*, 731 F.2d 1379, 1382 (9th Cir. 1984).  It is important to recognize that Plaintiff acknowledges that he does not have specific knowledge whether others have been subjected to the alleged policy.

Except as set forth above, the County of Kern's motion to dismiss is DENIED.

### CONCLUSION

For the reasons stated above:

1.  Defendant Kern County Superior Court's motion to dismiss the SAC is GRANTED WITH PREJUDICE AND WITHOUT LEAVE TO AMEND;

2.  Defendants Phillip Begelin and Dana Kinnison's motion to dismiss the SAC is GRANTED WITH LEAVE TO AMEND;

3.  Defendant Crestwood Behavioral Health, Inc. motion to dismiss is GRANTED WITH LEAVE TO AMEND;

4.  Defendant Philip Garza's motion to dismiss the SAC is GRANTED WITH LEAVE TO AMEND;

5.  Defendant County of Kern's motion to dismiss the SAC is GRANTED IN PART WITH PREJUDICE WITHOUT LEAVE TO AMEND AND GRANTED IN PART WITH LEAVE TO AMEND;

61

1    **6.   Plaintiff shall file a Third Amended Complaint as stated**

2    **above within 20 days of service of this Memorandum Decision.**

3    **Failure to timely comply will result in dismissal of this action.**

4    **There shall be no further opportunities to correct the multitude**

5    **of pleading defects about which Plaintiff has been advised.**

6         IT IS SO ORDERED.

7    **Dated:   May 12, 2008**                    /s/ Oliver W. Wanger
                                        UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26